**Carol KAUNTZ and Dennis Kauntz, Plaintiffs–Appellants,**

v.

**HCA–HEALTHONE, LLC, d/b/a North Suburban Medical Center, a Colorado limited liability company, Defendant–Appellee.**

No. 05CA2341.

Colorado Court of Appeals, Div. IV.

May 31, 2007.

As Modified on Denial of Rehearing Aug. 16, 2007.

Cristiano Law, LLC, Francis V. Cristiano, Greenwood Village, Colorado, for Plaintiffs–Appellants.

Dickinson, Prud'Homme, Adams & Ingram, LLP, Gilbert A. Dickinson, Molly P. Tighe, Porya Mansorian, Denver, Colorado, for Defendant–Appellee.

Leventhal Brown & Puga, P.C., Jim Leventhal, Benjamin Sachs, Denver, Colorado, for Amicus Curiae Antonio L. Snipes.

Kutak Rock, LLP, Melvin B. Sabey, Denver, Colorado, for Amicus Curiae Colorado Health and Hospital Association.

Kennedy Childs & Fogg, P.C., John R. Mann, Denver Colorado, for Amicus Curiae Colorado Health and Hospital Association.

Opinion by Judge CASEBOLT.

In this action against a hospital asserting negligence in permitting an untrained physician to practice there, the issue is whether § 12–36.5–203, C.R.S.2006, precludes the claim for damages asserted by plaintiffs, Carol Kauntz and Dennis Kauntz, against defendant, HCA–HEALTHONE, LLC, doing business as North Suburban Medical Center (NSMC). Concluding that it does, we affirm the trial court's judgment.

This action was initially filed as a medical negligence claim against a physician who treated plaintiff Carol Kauntz. Plaintiffs asserted that the physician negligently performed an elective epidural procedure that caused her to develop adhesive arachnoiditis, a condition that left her in severe pain and with limited movement. Following discovery, plaintiffs amended their complaint to include a claim for negligent credentialing against NSMC, asserting that NSMC was negligent in granting the physician privileges to perform epidural procedures because his training was inadequate.

NSMC moved for summary judgment, asserting that a provision of the Colorado Professional Review Act (CPRA), § 12–36.5–101, et seq., C.R.S.2006, precluded the claim.

The CPRA, among other things, encourages hospitals to use professional peer review committees staffed by physicians in making credentialing decisions, and provides for immunity to those persons and entities, among others, under certain conditions. Specifically, NSMC argued that § 12–36.5–203, which provides that professional review bodies "shall not be liable for damages in any civil action," dictated that it could not be liable for decisions made during the physician peer review process, which includes the granting of credentials. The trial court agreed and granted summary judgment. The claim against the physician was settled and is not before us.

On appeal, plaintiffs contend that § 12–36.5–203 does not limit the liability of NSMC to one of its patients but, instead, governs only physician-physician and physician-hospital relationships. Specifically, they argue that the statute is ambiguous as to its applicability, and the legislative history demonstrates that the General Assembly did not intend the liability limitation to apply to a patient's suit against a hospital for negligent credentialing. In response, NSMC argues that the statutory language clearly and unambiguously provides immunity from damages for professional review bodies "in any civil action" wherein a professional peer review has been conducted concerning the credentialing decision for the particular physician. We agree with NSMC.

## I. Standard of Review

■ We review a summary judgment de novo. Summary judgment is proper only upon a showing that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. C.R.C.P. 56(c); *McCormick v. Union Pac. Res. Co.*, 14 P.3d 346 (Colo.2000).

■ Likewise, statutory interpretation is a question of law that we review de novo. *Ryals v. St. Mary–Corwin Reg'l Med. Ctr.*, 10 P.3d 654 (Colo.2000).

## II. Principles of Statutory Construction

■ In construing a statute, our primary duty is to give effect to the intent of the General Assembly and adopt the statutory construction that best effectuates the purposes of the legislative scheme, looking first to the plain language of the statute. *Spahmer v. Gullette*, 113 P.3d 158, 162 (Colo.2005).

■ To effectuate the legislative intent, a statute must be read and considered as a whole and should be interpreted in a manner that will give consistent, harmonious, and sensible effect to all its parts. *State v. Nieto*, 993 P.2d 493, 501 (Colo.2000). There is a presumption that the General Assembly intends a just and reasonable result when it enacts a statute, and a statutory construction that defeats the legislative intent will not be followed. Section 2–4–201(1)(c), C.R.S.2006; *see Frohlick Crane Serv., Inc. v. Mack*, 182 Colo. 34, 37–38, 510 P.2d 891, 892 (1973). If the plain language of the statute is clear and unambiguous, we apply the statute as written, unless it leads to an absurd result. *E–470 Pub. Highway Auth. v. Kortum Inv. Co.*, 121 P.3d 331, 333 (Colo.App.2005).

■ If the statutory language unambiguously sets forth the legislative purpose, we need not apply additional rules of statutory construction to determine the statute's meaning. *People v. Cooper*, 27 P.3d 348, 354 (Colo.2001). If, however, the statutory language lends itself to alternative constructions and its intended scope is unclear, a court may apply other rules of statutory construction to determine which alternative construction is in accordance with the objective sought to be achieved by the legislation. *People v. Terry*, 791 P.2d 374, 376 (Colo. 1990). If the language of a statute is ambiguous or conflicts with other provisions, we then look to legislative history, prior law, the consequences of a given construction, and the goal of the statutory scheme. *People v. Luther*, 58 P.3d 1013, 1015 (Colo.2002); *Allely v. City of Evans*, 124 P.3d 911, 912–13 (Colo. App.2005).

■ "[W]here the interaction of common law and statutory law is at issue, we acknowledge and respect the General Assembly's authority to modify or abrogate common law, but can only recognize such changes when they are clearly expressed." *Vigil v. Franklin*, 103 P.3d 322, 327 (Colo.

2004). Thus, "[s]tatutes in derogation of the common law must be strictly construed, so that if the legislature wishes to abrogate rights that would otherwise be available under the common law, it must manifest its intent either expressly or by clear implication." *Vaughan v. McMinn*, 945 P.2d 404, 408 (Colo.1997) (quoting *Van Waters & Rogers, Inc. v. Keelan*, 840 P.2d 1070, 1076 (Colo. 1992)).

For purposes of our analysis, we will assume that under Colorado's common law, a hospital may be liable for negligently extending certain staff privileges to a physician. *See Austin v. Litvak*, 682 P.2d 41, 54 (Colo. 1984); *Kitto v. Gilbert*, 39 Colo.App. 374, 383, 570 P.2d 544, 550 (1977).

### III. Analysis and Application

■ We start by reviewing the plain language of the statute. Section 12–36.5–203 provides in pertinent part:

(1) The following persons shall not be liable for damages in any civil action with respect to their participation in, assistance to, or reporting of information to a professional review body in connection with a professional review action in this state, and such persons shall not be liable for damages in any civil action with respect to their participation in, assistance to, or reporting of information to a professional review body which meets the standards of and is in conformity with the provisions of the federal "Health Care Quality Improvement Act of 1986" ... [HCQIA], upon implementation of such act by the federal government:

(a) The professional review body....

Section 12–36.5–203(1)(a), C.R.S.2006. A "professional review action" means:

an action or recommendation of a professional review body which is taken or made in the conduct of professional review activity and which is based on the competence or professional conduct of an individual physician, which conduct affects or may affect adversely the clinical privileges of or membership in a professional society of the physician. "Professional review action" includes a formal decision by the professional review body not to take an action or

make a recommendation as provided in this paragraph (a) and also includes professional review activities relating to a professional review action.

Section 12–36.5–203(3)(a), C.R.S.2006.

A "professional review body" is defined as a "health care entity and the governing body or any committee of a health care entity which conducts professional review actions and includes any committee of the medical staff of such an entity when assisting the governing body in a professional review activity." Section 12–36.5–203(3)(b), C.R.S. 2006.

■ Thus, as applicable here, the plain words of the statute essentially state that a professional review body is immune from damages in any civil action brought against it with respect to its participation in a professional peer review proceeding.

■ Here, there is no dispute that NSMC, a health care entity, is a professional review body within the meaning of the statute. Accordingly, it cannot be held liable in "any civil action" in connection with a professional review action. "Any" means "all." *See Rios v. Mireles*, 937 P.2d 840, 843 (Colo. App.1996); *Austin v. Weld County*, 702 P.2d 293, 294 (Colo.App.1985). "Civil action" certainly encompasses a lawsuit asserting negligence brought by an injured person against a hospital. *See* C.R.C.P. 2. And plaintiffs do not dispute that NSMC conducted a professional review action in which it granted credentials to the involved physician to practice at NSMC and perform the procedure that injured them. Accordingly, subject to issues not raised here, plaintiffs' claim is barred by the plain language of the statute. *See St. Luke's Episcopal Hosp. v. Agbor*, 952 S.W.2d 503, 505 (Tex.1997)(statutory language providing that a health care entity participating in medical peer review activity "is immune from any civil liability" precludes patient suit for negligent credentialing, absent proof of malice).

■ This interpretation gives consistent, harmonious, and sensible effect to all parts of the CPRA. The CPRA contains two separate provisions that grant different types of im-

munity. The first is contained in Colo. Sess. Laws 1989, ch. 113, § 12–36.51–05 at 683. As in effect when this action was commenced, that provision granted immunity from suit to medical staff participants, governing boards and their members, and medical entities, in any civil or criminal action, including antitrust actions, brought by a physician who was the subject of the professional review. Immunity from suit recognizes an entitlement not to stand trial or face the other burdens of litigation and essentially prevents litigation from proceeding. *See City of Lakewood v. Brace*, 919 P.2d 231, 238 (Colo.1996).

The second provision concerning immunity, § 12–36.5–203, which is the statute at issue here, does not provide for immunity from suit. Instead, it provides immunity from damages and thus does not preclude, for example, declaratory judgment proceedings. Moreover, it is not limited by its language to claims brought by physicians, as was the case with § 12–36.51–05. Rather, it broadly applies to "any civil action." Hence, the two immunity provisions have different purposes and different effects.

If the provisions of § 12–36.5–203 apply only to limit claims asserted by physicians, as plaintiffs contend, there would have been no need to address the issue of immunity separately in another statutory section dealing specifically with physicians, and no need or reason to grant different types of immunity. And under such a reading, the damages immunity section would be surplusage (although narrower in scope) and duplicative of the immunity from suit provided by § 12–36.51–05. Such a reading would be contrary to the mandate that we must endeavor to read statutes to give effect to every word. *See City of Florence v. Bd. of Waterworks*, 793 P.2d 148, 151 (Colo.1990).

In addition, the language of § 12–36.5–203(3)(a) provides that a professional review action includes "a formal decision by the professional review body not to take an action." There would be no reason for a physician to sue a professional review body that decided not to take adverse action concerning hospital privileges. Rather, patients would be the only foreseeable category of persons who might bring a claim based on inaction.

Therefore, a reasonable explanation for this language is that this section of the statute was designed only to provide protection from patients' claims that could arguably arise out of the peer review process. The presence of this language reinforces our interpretation.

It is also significant that the CPRA requires peer review documents and records to be confidential and precludes their discovery in civil actions brought against a physician, with limited exceptions for certain litigation between a physician and the peer review entities. *See* § 12–36.5–104(10)(13), C.R.S. 2006. Like the separate immunity provisions discussed above, this provision provides another example of the distinctions drawn in the CPRA between suits involving peer review bodies and physicians, and litigation brought by others, including patients, against physicians.

Moreover, it would be inconsistent to preclude a patient's discovery of peer review documents dealing with an allegedly negligent physician, but still allow that patient's negligent credentialing claim to be asserted. If such a claim were allowed, both patients and hospitals would be at distinct disadvantages in proving their claims or defenses.

Our interpretation also furthers the legislative purposes set forth in the statute. Like its federal counterpart, the HCQIA, 42 U.S.C. § 11101, et seq., the CPRA provides certain immunities to those participating in peer review proceedings. The CPRA, however, extends beyond the HCQIA's purpose of providing immunity to persons involved in peer review proceedings. The state statute's purposes include protection of the public's health, safety, and welfare by regulating competition and unprofessional conduct; use of professional review committees to assist the state board of medical examiners; and encouragement of physicians to participate in peer review proceedings. Sections 12–36.5–101, 12–36.5–103, C.R.S.2006; *N. Colo. Med. Ctr., Inc. v. Comm. on Anticompetitive Conduct*, 914 P.2d 902, 906 (Colo.1996) (*Nicholas I*). Our interpretation serves to encourage physicians to participate in peer review proceedings because it provides immunity from damage claims to physicians who sit on peer review bodies. This immunity also comports

with the immunity that the state board of medical examiners enjoys, see Colo. Sess. Laws 1995, ch. 218, § 12–36–103(5) at 1056–57 (providing immunity to board of medical examiners "from any civil action based upon a disciplinary proceeding or other official act that such board member performs in good faith"; repealed effective Aug. 4, 2004, and now codified at § 12–36–118(3)(b), C.R.S. 2006, employing somewhat different terms), which is appropriate, given that peer review bodies act as arms of the state board. *See* § 12–36.5–103. It also protects the public inasmuch as negligence claims are likely to be reduced when the medical community polices its own conduct.

Contrary to plaintiffs' contention, our interpretation does not yield an absurd result because it prevents hospitals from being liable for negligent credentialing decisions when peer review activity has been undertaken. While patients may not sue hospitals under these circumstances, they nevertheless retain the right to sue negligent physicians personally. Thus, barring negligent credentialing damage claims in these circumstances does not leave a negligently injured patient without a remedy.

In addition, our interpretation does not preclude negligent credentialing claims which may assert that the particular hospital failed to have a qualifying peer review process in place, those which assert that the hospital failed to utilize peer review in responding to a physician's request for credentials, or other potential claims for which immunity may not be available. Indeed, as the supreme court interpreted § 12–36.5–203 in *North Colorado Medical Center, Inc. v. Nicholas,* 27 P.3d 828, 845 (Colo.2001)(*Nicholas II*), this section provides immunity for the described persons and groups only "when they act in accordance with the HCQIA." For participants in peer review to qualify for immunity under this provision, four standards must be met. The "professional review action" must be taken

(1) in the reasonable belief that the action was in furtherance of quality health care,

(2) after a reasonable effort to obtain the facts of the matter,

(3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and

(4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3).

*Nicholas II, supra,* 27 P.3d at 838–39 (quoting HCQIA, 42 U.S.C. § 11112(a)).

Thus, if peer review action is not pursued in accordance with these standards or is not undertaken at all, the immunity provided by the statute is not available. Hence, our interpretation does not foreclose all negligent credentialing claims. For these reasons, the result is far from unjust or absurd.

We note parenthetically that plaintiffs have not contended that NSMC has failed to demonstrate that it acted "in accordance with the HCQIA," or has failed to demonstrate its compliance with the four HCQIA factors noted in *Nicholas II.* Nor do plaintiffs contend that there are any genuine issues of material fact to resolve concerning those factors in this case. Therefore, we have not addressed their application here.

## IV. Ambiguity

Plaintiffs nevertheless contend that the statute is ambiguous because it is silent as to the extent of its applicability. We disagree.

▆▆▆ When a statute is silent concerning its applicable scope, such silence can create an ambiguity with respect to the reach of the statute. *See People v. Newton,* 764 P.2d 1182, 1189 (Colo.1988).

Here, however, we cannot conclude that the statute is ambiguous, because it is not silent on its applicable scope. Section 12–36.5–203 states that damage immunity applies "in any civil action." If that phrase were missing from the statute, it might be possible to infer silence. Its presence, however, dictates a contrary conclusion. While we can envision how the statute could have more explicitly prohibited patient claims, it is nevertheless clear as to its intended scope, and thus is not ambiguous.

## V. Conflict in Statutory Provisions

 Plaintiffs contend that there are statutory conflicts within the CPRA itself that justify reviewing legislative history and employing other aids in statutory construction. Although this issue was raised during oral argument, it was not presented to the trial court or in plaintiffs' opening brief. Therefore, we decline to review this contention. *See Estate of Stevenson v. Hollywood Bar & Cafe, Inc.*, 832 P.2d 718, 721 n. 5 (Colo.1992)(appellate court will not review issue not presented to trial court); *Schempp v. Lucre Mgmt. Group, LLC*, 75 P.3d 1157, 1164–65 (Colo.App.2003) (issue not raised in opening brief on appeal is not properly postured for review).

## VI. Abrogation of the Common Law

Plaintiffs further contend that the language of § 12–36.5–203 cannot be read to preclude negligent credentialing claims against hospitals because the General Assembly did not legislate with clear expression. We again disagree.

As previously noted, while the General Assembly has authority to modify or abrogate common law, courts recognize such changes only when they are clearly expressed, and thus the General Assembly must manifest its intent to do so either expressly or by clear implication. *See Vigil v. Franklin, supra,* 103 P.3d at 327; *Vaughan v. McMinn, supra,* 945 P.2d at 408.

Here, we conclude that the General Assembly either has expressly stated its intent to abrogate common law negligent credentialing claims brought by patients under these circumstances or, at the minimum, has done so by clear implication. While the statute does not state that it governs hospital-patient relations, the use of the words "any civil action" in describing the applicability of damages immunity makes it difficult, if not impossible, to discern a lack of clarity or of expression. Hence, even a "strict construction" of the statute, *see Vaughan v. McMinn, supra,* does not require a different result.

## VII. Legislative History

In light of our determination that the plain language of the statute controls, we decline plaintiffs' invitation to further review the legislative history, prior law, and the consequences of a particular statutory construction. *Cf. People v. Terry, supra,* 791 P.2d at 376.

## VIII. Estoppel

Plaintiffs argue that, even if immunity exists under these circumstances, NSMC should be estopped from asserting it, because NSMC made representations to the public that it delivers "quality care." We disagree.

 The following elements must be established to support a claim of equitable estoppel: the party to be estopped must know the facts and either intend the conduct to be acted on or so act that the party asserting estoppel must be ignorant of the true facts, and the party asserting estoppel must rely on the other party's conduct with resultant injury. *Comm. for Better Health Care for All Colo. Citizens v. Meyer,* 830 P.2d 884, 891–92 (Colo.1992).

Here, even if an estoppel claim could be asserted in view of the broad immunity granted in § 12–36.5–203, plaintiffs have presented no evidence that they relied upon any statement or representation by NSMC. Therefore, the claim fails as a matter of law.

## IX. On Rehearing

 On petition for rehearing, plaintiffs contend that they set forth sufficient contentions and evidence that NSMC violated HCQIA requirements in its credentialing action concerning the negligent physician's credentialing application. They assert that they demonstrated facts necessary to vitiate the immunity provisions of the CPRA, based upon NSMC's noncompliance with the HCQIA criteria as established in *Nicholas II.* We disagree.

NSMC's motion for summary judgment asserted, as relevant here, that it was entitled to immunity under § 12–36.5–203. In response, plaintiffs did not assert that there were genuine issues of material fact that would prevent the application of the statute

or that would preclude immunity. Nor did they contend that NSMC had failed to prove the factors the supreme court identified in *Nicholas II* that must be met before immunity can apply. Instead, plaintiffs simply asserted that § 12–36.5–203 did not apply to their claim because the statute governed only physician-physician and physician-hospital relationships. Indeed, neither plaintiffs nor NSMC cited *Nicholas II* in the summary judgment motion, the response thereto, or the supporting briefs, or in the motion to reconsider and response. Further, no party cited *Nicholas II* in the briefs on appeal, nor did plaintiffs contend that NSMC had failed to prove its entitlement to immunity under the HCQIA factors identified in that case.

Hence, the only issue the trial court addressed, and the only issue on appeal, is whether § 12–36.5–203 should be interpreted to apply to a patient's negligent credentialing claim against a hospital. *See Beauprez v. Avalos,* 42 P.3d 642, 649 (Colo.2002) (an issue not presented to or raised in the trial court will not be considered on appeal); *People v. Czemerynski,* 786 P.2d 1100, 1107 (Colo.1990) (issue raised for first time in reply brief is not properly before appellate court); *Flores v. Am. Pharm. Servs., Inc.,* 994 P.2d 455, 458 (Colo.App.1999) (an appellate court will not consider issues, arguments, or theories not previously presented in trial proceedings).

Accordingly, we reject plaintiffs' contention that we should reverse the trial court's dismissal.

The judgment is affirmed.

Judge HAWTHORNE and Judge BERNARD concur.